UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------- x
                                                    :
RANDY A. SHRACK                           :          3:16 CV 2064 (RMS)
                                                    :
V.                                                  :
                                                    :
NANCY A. BERRYHILL,                       :
ACTING COMMISSIONER OF            :
SOCIAL SECURITY                           :          DATE: JUNE 7, 2018
                                                    :
---------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

Disability Insurance Benefits ["DIB"].

I.      ADMINISTRATIVE PROCEEDINGS

On or about May 10, 2013, the plaintiff filed an application for DIB benefits claiming he

has been disabled since July 18, 2007, due to a "[s]pine handicap consisting of [two] rods and [six]

screws." (Certified Transcript of Administrative Proceedings, dated February 21, 2017 ["Tr."]

219-220, 231; see Tr. 122). The plaintiff's application was denied initially (Tr. 122-33; see Tr. 134,

149-53) and upon reconsideration. (Tr. 135-47; see Tr. 148, 154-58).[1] On April 29, 2014, the

plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 159-160; see Tr.

161-78), and on June 5, 2015, a hearing was held before ALJ Edward F. Sweeney, at which the

plaintiff and a vocational expert, Estelle Hutchinson, testified. (Tr. 36-89). On September 25, 2015,

---

[1] The plaintiff has been represented by counsel since March 31, 2014. (Tr. 179-82).

ALJ Sweeney issued an unfavorable decision denying plaintiff's claim for benefits. (Tr. 16-35). On October 27, 2015, the plaintiff requested review of the hearing decision (Tr. 13-15), and on October 19, 2016, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On December 15, 2016, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on March 31, 2017, the defendant filed her answer and administrative transcript, dated February 21, 2017. (Doc. No. 15; *see* Doc. Nos. 14, 16). On April 26, 2017, the case was transferred to Magistrate Judge Joan G. Margolis upon consent of the parties (Doc. No. 20; *see* Doc. No. 19), and on May 1, 2018, the case was reassigned to this Magistrate Judge. (Doc. No. 36).

On July 25, 2017, the plaintiff filed his Motion to Reverse the Decision of the Commissioner, with brief in support. (Doc. No. 25; *see* Doc. Nos. 17-18, 21-24).[2] On December 20, 2017, the defendant filed her Motion for an Order Affirming the Decision of the Commissioner and brief in support. (Doc. No. 35; *see* Doc. Nos. 26-27, 29-34).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 25) is *granted in part and denied in part*, and defendant's Motion to Affirm (Doc. No. 35) is *denied in part and granted in part* such that this case is remanded for the reasons stated in this Ruling.

## II.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported

---

[2] Attached to the plaintiff's Motion and brief is a copy of case law.

by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## III.    DISCUSSION

### A.    THE ALJ'S DECISION

Following the five step evaluation process,[3] the ALJ found that the plaintiff's date last insured under Title II of the Social Security Act was December 31, 2012 (Tr. 21), and that he has not engaged in substantial gainful activity from his July 18, 2007 onset date through his date last insured. (Tr. 21, citing 20 C.F.R. § 404.1571 *et seq.*).[4] The ALJ concluded that the plaintiff has the severe impairments of degenerative disc disease and obesity (Tr. 22, citing 20 C.F.R. § 404.1520(c)), but that the plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 22, citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526), and in particular, that the plaintiff's degenerative disc disease does not meet Listing 1.04. (Tr. 22). At step four, the ALJ found that the plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he "could frequently climb ramps and stairs and never climb ladders, ropes, or scaffolds[;] . . . frequently balance and occasionally stoop, kneel,

---

[3] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[4] The plaintiff testified at his hearing that his most recent employment was as a pest control and wildlife technician with Yale Termite and Pest Control, for which he "drove around checking houses for bugs [and] [t]reating for mice, ants, stuff like that[, a]nd trapping wild animals." (Tr. 45). Prior to working for Yale Termite and Pest Control, the plaintiff worked for Pupper Septic where he cleaned septic tanks and drove the truck (Tr. 45); before that, he worked for two years as a plumbing apprentice at Straub Plumbing. (Tr. 45). The plaintiff testified that his job duties included carrying a forty-foot ladder, carrying a second ladder up the forty-foot ladder, going into crawlspaces and attic spaces, and carrying a one-gallon container of liquid pesticides. (Tr. 72).

crouch, and crawl[; and] . . . ha[s] to avoid exposure to vibration and workplace hazards such as moving machinery and unprotected heights." (Tr. 23-27). Finally, the ALJ found that the plaintiff was not capable of performing any past relevant work (Tr. 28, citing 20 C.F.R. § 404.1565), but that, considering the plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed through his date last insured. (Tr. 28-29, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Accordingly, the ALJ concluded that the plaintiff was not under a disability between the alleged onset date of July 18, 2007 through December 31, 2012, his date last insured. (Tr. 29, citing 20 C.F.R. § 404.1520(g)).

B.    THE PLAINTIFF'S CLAIMS

The plaintiff contends that the ALJ erred in his assessment of the plaintiff's pain by failing to deal with the plaintiff's claims of pain (Doc. No. 25-1 ["Pl.'s Mem."] at 32-39), and addressing them "under the guise of a credibility finding." (*Id.* at 34). According to the plaintiff, the ALJ "cherry-picked" the record by noting the plaintiff's "ability to ambulate throughout the relevant period[,]" the plaintiff's "ability to care for his two children while his wife was at work[,]" and the plaintiff's work on the farm. (Pl.'s Mem. at 35-37; *see* Tr. 25, 27). The defendant argues that the ALJ properly considered the plaintiff's allegations of pain, and after doing so, concluded that they were not entirely credible in light of their inconsistency with other evidence in the record. (Doc. No. 35 ["Def.'s Mem."] at 4-5).

Additionally, the plaintiff contends that the ALJ erred in assigning "great weight" to the opinions of the State Agency medical consultants, while affording little weight to the opinions of Dr. Mitchell Garden, and the medical source statement of Dr. John Turchiano. (Pl.'s Mem. at 39-44). The defendant argues that Dr. Garden did not provide a medical opinion, but rather, reported

"factual assertions[,]" and issued an opinion on the plaintiff's ability to work, which is an opinion reserved to the Commissioner. (Def.'s Mem. at 6-7). Additionally, the defendant argues that Dr. Turchiano's opinion post-dated the relevant period of the ALJ's decision, was not supported by the objective medical evidence, and was inconsistent with the other evidence in the record. (Def.'s Mem. at 7-9).

C.    <u>ASSESSMENT OF THE PLAINTIFF'S PAIN</u>

As a preliminary matter, the regulations provide "that subjective assertions of pain *alone* cannot ground a finding of disability." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (emphasis in original) (citing 20 C.F.R. § 404.1529(a)). Accordingly, first the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). In this case, the ALJ concluded that the plaintiff has the severe impairments of degenerative disc disease and obesity (Tr. 22), and that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" (Tr. 27).

Once the ALJ makes that decision, the ALJ must determine "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(a)); *see Watson v. Berryhill*, No. 17-2156, 2018 WL 2123257, at *2-3 (2d Cir. May 9, 2018) (summary order). In addition to weighing objective medical evidence, the ALJ must consider the following: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; the factors that precipitate and aggravate symptoms; the type, dosage, effectiveness and side effects of any medications taken to alleviate the pain; treatment, other than medication, received for pain relief; any measures other than treatment that the individual uses to relieve pain;

and any other factors concerning functional limitations and restrictions due to pain. Social Security Ruling ["SSR"] 97-7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996)[5]; *see also* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); *Meadors v. Astrue*, 370 F. App'x 179, 183-84 (2d Cir. 2010) (summary order); *Taylor v. Barnhart*, 83 F. App'x 347, 350-51 (2d Cir. 2003) (summary order). As explained in SSR 96-7p, "the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements." *Id.*, 1996 WL 374186, at *4.

At this second step, the ALJ concluded that, although the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ., the claimant's statements . . . are not entirely credible for the reasons explained in [the] decision." (Tr. 27). The ALJ stated that the plaintiff "reported a full range of activities of daily living[,]" from caring for his two children while he wife was at work, to preparing meals, performing some housework, mowing the lawn with a tractor mower, and driving short distances. (Tr. 23). He concluded that the "longitudinal medical record and the claimant's reported activities of daily living support a finding that his back impairment and obesity result in some work-related limitations. His abilities to lift, carry, and perform posturals are affected, and the [RFC] reflects this." (Tr. 27). The ALJ then noted that the plaintiff could "ambulate independently[,]" he "complained of morning stiffness and nighttime soreness[,]" he denied weakness but reported leg fatigue after prolonged walking, and months after the date last insured, "without any significant intervention, the claimant reported the ability to care for his two children[,]" one of whom was an

---

[5] SSR 96-7p was rescinded and superseded by SSR 16-3p on October 25, 2017. SSR 16-3p, 2017 WL 5180304, at *1 (S.S.A. Oct. 25, 2017). As stated in SSR 16-3p, ALJs apply 16-3p in decisions made on or after March 28, 2016, and "[w]hen a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review." *Id.* The decision was issued in this case on September 25, 2015; accordingly, SSR 96-7p applies.

infant for the relevant period. (Tr. 27). The ALJ concluded, "In sum, the claimant's reported activities of daily living and his complaints are inconsistent with a debilitating spinal impairment." (Tr. 27). However, to reach this conclusion, the ALJ focused on some reported activities of daily living to the exclusion of the others, and failed to consider the other factors articulated in 20 C.F.R. §§ 404.1529(c)(ii)-(vii). *See also* SSR 97-7p, 1996 WL 374186, at *3.

1.     <u>ACTIVITIES OF DAILY LIVING</u>

The plaintiff testified at his hearing that he is the primary daytime caregiver for his children. (Tr. 50, 249). He reported that he plays with his son at the table because he cannot get down on the floor to play with him. (Tr. 50). Similarly, the plaintiff reported to Dr. Lauren Burke at the Orthopedic Associates of Hartford, P.C., that he is able to perform activities of daily living, including take care of his children, but that he has lower back pain that causes numbness, radiates down the back of both of his legs to his ankles, and makes it difficult to rise from a seated position. (Tr. 437, 497; *see* Tr. 437-39, 497-99). The plaintiff also testified that he is able to bathe, dress and change his son "when [he] need[s] to[,]" but he cannot lift his son onto the changing table and he sometimes relies on his daughter for help. (Tr. 50, 250). According to the plaintiff, he does "a little bit" of dishwashing and sometimes "throw[s] a few things in the washer" but otherwise does not do laundry because he cannot carry laundry baskets around the house. (Tr. 51, 252). The plaintiff only occasionally goes to the grocery store with his wife because it requires too much walking; when he does go with her, he sits in a motorized cart. (Tr. 52). He uses a shower chair most of the time (Tr. 61) and requires his wife's assistance to dress and bathe because his "mobility is limited and safety is a big concern." (Tr. 250). The plaintiff cooks meals for his children at night and can cook anything prepared on the stove, but cannot easily bend to reach the oven. (Tr. 51, 249, 251). The plaintiff's testimony is consistent with Dr. Garden's medical record from April

2011 in which he rated the severity of the plaintiff's low back pain as "moderate[,]" aggravated by activities, and he noted that the plaintiff's range of motion was limited due to pain, "especially forward bending." (Tr. 659-62, 1545-47, 1550-52). The plaintiff testified at the hearing that he cannot do outdoor chores such as mowing the lawn or gardening (Tr. 51), but wrote on a December 9, 2013 Activities of Daily Living Form that he "can mow with a tractor and [] help when [he] can around the house with little tasks." (Tr. 252).

Additionally, although the ALJ considered the plaintiff's ability to drive short distances as support for his conclusion that the plaintiff can perform a "full range of activities of daily living[]" (Tr. 27), the plaintiff repeatedly reported that he could not sit for long periods and had increased pain when driving. (Tr. 316, 1224). The plaintiff testified that sharp and continuous pain in his back and knees prevent him from sleeping, walking "long distances without stopping[,]" and standing or sitting "for long periods of time[,]" which he described as fifteen to twenty minutes. (Tr. 44, 46-47). He spends "most of [his] time" in a recliner with his feet up (Tr. 56); he is tired "most of the time" because of his inability to sleep due to pain. (Tr. 58, 250). The plaintiff testified that he "probably" has to lie down for about four hours in an eight-hour period because he "get[s] uncomfortable and . . . [cannot] find . . . a position that [he] can get some kind of relief." (Tr. 62-63).

Similarly, Dr. Garden noted that driving and sitting "is not beneficial to him in his condition." (Tr. 316, 1224). Additionally, Dr. Garden stated that, "although [he felt that the plaintiff] does have the capacity of doing some . . . very sedentary type of work[,]" he did not think that the plaintiff could "compete in a competitive work environment" that requires him to "come in every day, sit and do activities." (Tr. 316, 1224). And though the plaintiff was the primary daytime caregiver for his children during the relevant period, Dr. Garden did "not feel that caring

for a young child by himself[]" was reasonable for the plaintiff in light of his "lifting/activity restrictions as well as the need for pain medication during [his] early postoperative stage." (Tr. 373). As discussed at length below, the plaintiff's need for pain medication did not improve following that "early postoperative stage[.]" (Tr. 373).

The ALJ accurately noted that the plaintiff was engaging in farm work, and that, in March 2011, he sought care for a laceration to his knee sustained when he was chopping wood. (Tr. 23-24; *see* Tr. 889-90; *see also* Tr. 310 (Dr. Garden's note: the plaintiff reported that "with the activities that he has been doing on the 'farm' has [led] to increased pain."), Tr. 319 (Dr. Garden's note: "The mother made me aware that he has been doing activities that were more than what was told . . . including moving of boulders and other activities although he was not released to do this."), Tr. 523-32, 882 (emergency room record: left knee laceration from chopping wood with axe)). However, the ALJ's recitation excludes all entries of the plaintiff's limitations and his years of living with pain that his providers attempted to control with multiple prescription pain relievers.

## 2. FREQUENCY, INTENSITY, AND TREATMENT FOR PAIN

In addition to assessing plaintiff's activities of daily living and the plaintiff's statements related thereto, the ALJ must consider (1) the duration, frequency and intensity of the plaintiff's pain; (2) the factors that precipitate and aggravate symptoms; and (3) the treatment received for pain relief. SSR 97-7p, 1996 WL 374186, at *3. "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for

that weight." *Id.* at *2. The record is replete with evidence of the frequency and intensity of the plaintiff's pain and the treatment he received, yet the ALJ did not discuss his reasons for his credibility finding in light of the plaintiff's medical record.

The plaintiff has had a history of back pain since June 2006. (*See* Tr. 782-85).[6] On December 27, 2006, the plaintiff was involved in a motor vehicle accident resulting in a sprain of his left shoulder and lower back pain. (Tr. 786-94).[7] The next day, Dr. Steven Saunders diagnosed the plaintiff with a "[l]umbar sprain, lumbar-disc displacement and discogenic pain[,]" and a left shoulder sprain. (Tr. 1226-27).[8] In the following months, the plaintiff was seen by Dr. David C. George, an orthopedist, for "cervical strain and possible discogenic pain; left shoulder strain; lumbar strain; [and] previous history of discogenic pain, lumbar spine[.]" (Tr. 293-95, 300-01; *see* Tr. 299-302, 1228-32).[9]

The plaintiff began treating with Dr. Garden on July 16, 2007, two days before his alleged onset date, for increasing back and lower extremity pain. (Tr. 369-70, 1003-04, 1182-83). An MRI taken eight days later revealed "[d]egenerative disc disease at L4-5[]"; "a central disc extrusion present along with ligamentum flavum hypertrophy causing minimal spinal stenosis[]"; and "left lateral disc extrusion which encroaches the left exit foramen[]" at L5-S1. (Tr. 363, 376, 1019-20, 1453-54; *see* Tr. 362-63, 375-76, 1453-54; *see also* Tr. 1185).

---

[6] Although the Court has reviewed the entire record, the Court does not reference medical treatment unrelated to the ailments for which plaintiff seeks disability.

[7] The plaintiff testified that his back and knee pain date back to this car accident in December 2006 when he was "T-boned" by a driver who pulled out in front of him. (Tr. 57). Following the plaintiff's accident, he received workers' compensation benefits. (*See generally* Tr. 380).

[8] Plaintiff underwent physical therapy from January 10 to May 21, 2007 (Tr. 802-47; *see* Tr. 798, 800-01), June 1 to August 10, 2007 (Tr. 1152-73), and December 11, 2007 to May 13, 2009 (Tr. 1174-1180, 1237-65, 1390-1441, 1490-1518, 1526-41).

[9] An MRI of plaintiff's cervical spine taken on January 24, 2007 was "[n]ormal." (Tr. 797, 880).

On September 14, 2007, at the age of 27, the plaintiff underwent a lumbar discogram with Dr. David Kloth after "fail[ing] to respond to non-steroid inflammatory drugs[,]" epidural steroid injections, "chiropractic treatment, physical therapy, [or] other conservative modalities or treatment." (Tr. 296, 398; *see* Tr. 296-98, 398-400, 849-51, 853-55; *see also* Tr. 374, 401-02, 856-69, 1187-88). Dr. Kloth noted that "[t]he patient is fairly set on having lumbar fusion at this juncture if the discogram was positive, which indeed it was." (Tr. 297).

Accordingly, on October 29, 2007, the plaintiff underwent back surgery with Dr. Garden. (Tr. 364-67, 976-83, 986-89 (bearing surgery date of October 30, 2007), 995-1001, 1041-44 (same); *see* Tr. 368, 1002 (the plaintiff wanted to proceed to surgery without pursuing conservative treatment); *see also* Tr. 373, 1005-18). The plaintiff experienced pain and walked with an assistive device in the months following the surgery (Tr. 359-61, 1189-92), and although the plaintiff was caring for his young child at that time, Dr. Garden did not feel that such caregiving was reasonable for the plaintiff in light of his restrictions and need for pain medication. (Tr. 373).

On January 31, 2008, Dr. Garden noted that the plaintiff "seems to be doing very well[]"; Dr. Garden "recommended [that the plaintiff] consider job retraining or vocational retraining secondary to the fact that [his former work as an exterminator] requires him to get into some awkward positions in very tight spaces" and that would place the plaintiff at an "increased risk for re-injury of his back." (Tr. 358, 1193; *see* Tr. 352, 1196 (Dr. Garden's April 3, 2008 note reads: "He is disabled from occupation.")). In March 2008, the plaintiff reported to Dr. Garden that he felt he had "plateaued[,]" and that he was doing "his best not to take [any pain medicine] and [did] not wish to have any medicine." (Tr. 357, 1198). A CT scan of the plaintiff's lumbar spine revealed a "5 mm site of osseous fusion posteriorly[]" at L4-L5, and "[m]ild obliteration of epidural fat along the left lateral aspect of the spinal canal at L4-L5 and L5-S1" which was "likely

to be due to granulation tissue, but a small amount of disc density tissue in the proximal left L5-S1 neural foramen may be present." (Tr. 355-56, 1455-56). MRI results revealed "[l]eft laminectomy defects . . . noted at the L4-L5 and L5-S1 levels with scar formation in the left lateral recess." (Tr. 353-54, 1457-58; *see also* Tr. 348-49, 1459-60).

On May 15, 2008, Dr. Garden noted that the plaintiff had "[d]elayed union symptoms of nonunion L4-5 and L5-S1[]" (Tr. 347, 1197, 1201, 1278) for which revision surgery was planned.[10] (*See* Tr. 345-46, 1198, 1202, 1277). The plaintiff repeatedly reported "increasing" pain (Tr. 346, 351, 1198-99), and in June 2008, Dr. Garden noted his concern that the plaintiff's "intractable pain" was leading to an increase in prescription drug use which was putting the plaintiff at risk for becoming "narcotic dependent[.]" (Tr. 350, 1200). The plaintiff was taking Percocet prescribed by Dr. Garden to "[h]opefully . . . hold his pain[]" (Tr. 1203), although, on July 22, 2008, Dr. Garden noted that the Percocet was no longer helping the plaintiff's pain. (Tr. 345, 1203, 1276).[11]

On August 18, 2008, the plaintiff underwent a revision surgery. (Tr. 342, 912-13, 924-26, 1271-1375; *see* Tr. 330, 914-15, 1283-1319, 1321-33; *see generally* Tr. 1370-73). By September 2, 2008, he was "doing very well[,]" and he was not taking pain medication during the day. (Tr. 340, 1205).[12] After complaining of pain in late October (*see* Tr. 337), the plaintiff underwent an MRI of his lumbar spine on November 6, 2008 which revealed no evidence of stenosis or disc extrusion. (Tr. 336, 344, 1461). Upon review of the MRI results, Dr. Garden opined that the plaintiff's pain was "most likely" due to "post incisional pain[]" (Tr. 335, 1209), and was muscular in nature. (Tr. 334, 1210). However, at that time, Dr. Garden noted his concern that the plaintiff

---

[10] An MRI of the plaintiff's lumbar spine taken on May 29, 2008 revealed post-operative changes, but no evidence of spinal stenosis, and no focal disc extrusion. (Tr. 1459-60).

[11] On August 7, 2008, the plaintiff underwent an Independent Medical Examination in connection with his workers' compensation claim. (Tr. 1267-68).

[12] In the following months, the plaintiff continued to report that he was doing well. (Tr. 338-39, 1206-07).

is "going through 180 pain pills a month." (Tr. 334, 1210).  By the end of December 2008 and January 2009, the plaintiff was improving.  (Tr. 332-33, 1211-12).

On February 25, 2009, the plaintiff underwent a CT scan after complaining of increased pain for which pain medication did not provide relief (*see* Tr. 328, 512-13, 878-79, 1213, 1450-51); the results revealed mild multilevel congenital spinal canal stenosis.  (Tr. 327, 1451; *see* Tr. 326-27).  The MRI performed on March 3, 2009 revealed degenerative disc disease at all lumbar levels.  (Tr. 322-23, 1462-63).

On March 2, 2009, the plaintiff was seen at the emergency room at Danbury Hospital with a concern that he was using too much pain medication.  (Tr. 537-48, 891-901, 1464-88).  The plaintiff "admitted . . . that he [was] likely addicted to Percocet[]"; he was combative, agitated and verbally abusive.  (Tr. 895).  Dr. Garden saw the plaintiff shortly thereafter; he did not find the plaintiff's medication use a "major concern[.]"  (*See* Tr. 324-35, 1214-15).  On April 14, 2009, the plaintiff reported to Dr. Garden that his pain medicine was not helping at all and that he had increased pain in his lower back.  (Tr. 321, 1216).  Dr. Garden ordered EMG nerve conduction studies, which were performed in July 2009; the results were "abnormal . . . showing left S1 radiculopathy."  (Tr. 378; *see* Tr. 321, 1216, 1543-44).  Dr. Garden also referred the plaintiff for pain management services.  (Tr. 320, 1217).

At the end of May 2009, Dr. Garden revisited the issue of whether the plaintiff needed detoxification after his mother contacted Dr. Garden to report that he had run out of pain medication, lost his temper and allegedly struck his wife.  (Tr. 319, 1218).  The plaintiff's mother also reported that, for the past two or three months, the plaintiff "has been doing activities that were more than what was told[.]" (Tr. 319, 1218).  Dr. Garden did "not feel [that the plaintiff was]

addicted to the medication []" as the plaintiff "ha[d] been pretty compliant with medicines, usually staying within the prescribed dosage and the time frame." (Tr. 1219).

On May 29, 2009, the plaintiff was seen by Dr. Carlesi for pain management. (*See* Tr. 1520-23; *see* Dr. Garden's notes: Tr. 318, 317, 1222-23). Dr. Carlesi noted that, upon examination, the plaintiff was "[s]ignificant for his current pain syndrome, numbness and tingling in his legs and chronic lower back pain." (Tr. 1522). Specifically, an examination of "the posterior elements of the lumbar spine reproduced pain bilaterally on palpation"; he had "a straight leg raise that was positive at 40 degrees bilaterally with referred pain to the back and posterior thighs[]"; there was a sensation of numbness noted in the lower extremities; posterior superior iliac spines "were very tender to palpation[]" as were the "[p]osterior aspects of the gluteal and piriformis muscles"; and heel-to-toe walking was "difficult secondary to pain." (Tr. 1523). Dr. Carlesi recommended a series of three caudal epidural steroid injections. (Tr. 1523.).

On September 3, 2009, the plaintiff reported to Dr. Garden that his workers' compensation carrier was requiring him to do five job searches a week, which required him to do a lot of driving, and "sitting activities . . . caus[ing] increased pain." (Tr. 316, 1224). In response to the plaintiff's report, Dr. Garden noted that this activity "is not beneficial to him in his condition." (Tr. 316, 1224). Dr. Garden stated that, "although [he felt that the plaintiff] does have the capacity of doing some . . . very sedentary type of work[,]" Dr. Garden did not think that the plaintiff could "compete in a competitive work environment" that requires him to "come in every day, sit and do activities." (Tr. 316, 1224). Dr. Garden also noted his plan to get the plaintiff off of prescription pain relievers, and he recommended Suboxone treatment. (Tr. 316, 1224).[13] The next day, the plaintiff was seen

---

[13] In September 2013, the plaintiff was seen at the emergency room at Sharon Hospital for detoxification from his opioid prescription pain relievers. (Tr. 443-47, 768-71, 774-78). He was admitted for opiate withdrawal from September 13 to 15, 2013. (Tr. 448-51).

by Dr. Carlesi who noted that the plaintiff had "no relief" from an epidural injection administered two weeks prior. (Tr. 1524). On October 1, 2009, Dr. Garden opined that the plaintiff does not have the capacity to do more than sedentary work due to increased pain while driving and his "difficulty sitting for any significant period of time[.]" (Tr. 314).

The plaintiff continued to see Dr. Garden over the next several months; his condition was "status quo[]" on Percocet. (Tr. 311-13). The plaintiff was prescribed Darvocet and Tylenol with Codeine. (Tr. 311-13). On August 26, 2010, the plaintiff reported to Dr. Garden that the activities he had been doing on the farm had led to increased pain. (Tr. 310). Dr. Garden opined that, although the plaintiff "may do activities as tolerated[,]" he is "going to be plagued with chronic pain." (Tr. 310).

On October 27, 2010, Dr. Garden noted that the plaintiff should consider job re-training, and that, if the plaintiff wishes to go back to work, Dr. Garden would recommend limiting lifting to twenty pounds. (Tr. 309). After Darvocet was taken off the market in late 2010, the plaintiff was prescribed Ultram, but that caused nausea; Arthrotec and Vicodin were prescribed. (Tr. 307-08).

As of April 2011, Dr. Garden rated the severity of the plaintiff's low back pain as "moderate[,]" aggravated by activities, and he noted that the plaintiff's range of motion was limited due to pain, "especially forward bending." (Tr. 659-62, 1545-47, 1550-52). In July, Dr. Garden prescribed Soma for the plaintiff's pain (Tr. 662, 1553), but in October 2011, the plaintiff reported that it did not give him relief and caused stomach upset. (Tr. 663-64, 1554-55). Dr. Garden continued to see the plaintiff every three months, prescribing Vicodin and Athrotec for pain. (*See* Tr. 665-71, 1589-91; *see also* Tr. 418-19, 682-83).

In addition to the care and treatment the plaintiff received from Dr. Garden, the plaintiff was seen by Dr. John Turchiano, his primary care physician, for, *inter alia*, his back pain. (*See* Tr. 429-30). In November and December 2012, Dr. Turchiano saw the plaintiff for low back pain, radiculopathy, parasthesis, and lower extremity weakness, for which he prescribed Gabapentin. (Tr. 431-34, 734-37). On December 4, 2012, the plaintiff underwent an MRI of his lumbar spine which revealed "evidence of previous left-sided transforminal lumbar interbody fusion procedure at L4-L5 and L5-S1." (Tr. 426-28, 510-11, 717-19, 729-31, 1624-26, 1636-38).

On November 14, 2012 and again on January 4, 2013, Dr. Turchiano referred the plaintiff to Dr. Brian Riordan for the plaintiff's lower back pain (*see* Tr. 679-80, 686-90, 1586-87, 1593, 1595-96; *see also* Tr. 740-41, 1641-44, 1647-48), and upon examination on February 12, 2013, Dr. Riordan noted restricted flexion, and pain upon flexion and extension of plaintiff's lumbosacral spine. (Tr. 692-94, 1598-1601). Dr. Riordan assessed the plaintiff as having "[c]hronic pain with elements of failed back syndrome and chronic radiculopathy." (Tr. 693).

At the time of his hearing on June 5, 2015, the plaintiff testified that he regularly takes Advil for the pain, and "another pill for the nerve pain to try to help with it and stuff[,]" but that medication is not effective. (Tr. 47). At that time, the plaintiff had not been on prescription pain medication for two years. (Tr. 54). He said the medication was not helping with the pain, and that he was prescribed "high amounts" of Oxycontin and his providers "wanted him to go higher[,]" but he "[did not] want to live life on pain medicine like that." (Tr. 54). The plaintiff explained that he declined an increase in his Oxycontin prescription because he did not "like the feeling that it was giving [him]. . . . [He] was pretty much sick to [his] stomach . . . [a]nd [his] head was extremely fuzzy when [he] took it." (Tr. 59). At that time, the plaintiff was "detoxing[]" from Oxycontin; he began treating with Dr. Turchiano who advised him to go to the hospital to be taken off the

Oxycontin properly. (Tr. 59-60). The plaintiff explained that he essentially had to make a choice between stopping the medication and being in pain, or continuing the medication and being in pain with mental fogginess and stomach problems. (Tr. 60). The plaintiff was prescribed Gabapentin at nighttime, and it did not help, although he is still taking it. (Tr. 58-59). According to the plaintiff, he will not take pain medicine again because he does not want to "be an addict again." (Tr. 64-65).

The foregoing treatment history includes ample references to the plaintiff's history of pain, and pain management, yet, in his decision, it is not clear from the ALJ's conclusion that he considered the plaintiff's history of pain, the dosage of prescription pain relievers, the several referrals for pain management,[14] and the thread of entries reflecting consistent and unmanaged pain resulting from the plaintiff's back impairment.[15] The ALJ's limited reading of the record is done at the exclusion of numerous references, by the plaintiff and by his treating providers, to the plaintiff's limitations caused by a long history of pain, and the treatments he received for this pain.

In cases in which there is "conflicting evidence about a claimant's pain, the ALJ must make the credibility findings[,]" and such findings are subject to deference. *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999). This case is remarkable for consistency in the record regarding the plaintiff's complaints of, and treatment for, pain resulting from his back impairment; indeed, the ALJ found that the back impairment was severe. The plaintiff's treating doctors did not discount his

---

[14] In addition to Dr. Garden's referrals, Dr. Turchiano's records, which largely post-date the plaintiff's date last insured, reflect several attempts to manage the plaintiff's pain. In March and April 2013, Dr. Turchiano referred the plaintiff to UConn Orthopedics, Yale Department of Orthopedics, Seifert & Ford Danbury Clinic, and UMass Neurosurgery for his low back pain from his "[e]xtruded left central disc protrusion at L3-L4 with left L4 nerve root impingement." (Tr. 697, 701, 707, 720, 1604, 1606, 1608, 1614, 1616, 1618, 1627; *see* Tr. 695-704, 707-11, 720-21, 1607). He also referred the plaintiff to Lucien Parrillo for pain management. (Tr. 705-06, 1612-13). On July 2, 2013, he referred the plaintiff to Kathleen Abbot for pain management for the plaintiff's back pain, hip pain, and leg pain (Tr. 722-23, 1629), and to UConn Orthopedics for the plaintiff's back pain. (Tr. 724, 1631).

[15] Similarly, in her motion, defendant only addresses plaintiff's activities of daily living in support of her contention that the ALJ "properly considered [the] plaintiff's allegations of pain[.]" (Def.'s Mem. at 3-5).

complaints of pain, but rather, prescribed pain medication to lessen his symptoms. They referred the plaintiff for pain management, and to specialists for further testing.

In his decision, the ALJ notes plaintiff's restricted or limited range of motion (Tr. 24-26), his failure to improve following two back surgeries (Tr. 24-25), and his failure to get relief from pain medication. (Tr. 25-26). Yet he concludes that the intensity, persistence and limiting effects of the plaintiff's symptoms are not entirely credible because the plaintiff can "ambulate independently[,]" "complained of morning stiffness and nighttime soreness[,]" and was able to care for his children. (Tr. 27). The ALJ's decision does not make it clear that he considered the plaintiff's pain, and pain treatment, or that he based his credibility finding on anything other than his selective reading of the record and his selected references to activities that the plaintiff can perform. Moreover, the ALJ's credibility finding and his assessment of the plaintiff's pain did not comply with the ALJ's "obligation to consider 'all of the relevant medical and other evidence[.]'" *Genier*, 606 F.3d at 50 (quoting 20 C.F.R. § 404.1545(a)(3)). Accordingly, this case shall be remanded to the ALJ to consider the evidence in the record and then reassess the plaintiff's pain in accordance with the factors set forth under 20 C.F.R. § 404.1529(c)(3). *See Evans v. Colvin,* 649 F. App'x 35, 36 (2d Cir. 2016) (summary order) (ordering remand to make specific credibility findings relating to the plaintiff's complaints of pain); *see also Pino v. Berryhill*, No, 3:17CV26(AWT), 2018 WL 1419793, at *2-5 (D. Conn. Mar. 22, 2018); *Rivera v. Astrue*, No. 3:11CV100(SRU)(WIG), 2012 WL 3727264, at *9-12 (D. Conn. May 3, 2012).[16]

    D.    ASSESSMENT OF TREATING PHYSICIAN OPINIONS

The treating physician rule requires that "the opinion of a claimant's treating physician as

---

[16] The plaintiff also contends that the ALJ erred in posing a flawed hypothetical to the vocational expert, and that the vocational expert's answer was "defective." (Pl.'s Mem. at 44-53). In light of the conclusion reached above, the Court need not address the plaintiff's step five argument because a reconsideration of the evidence may change his RFC.

to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

On October 31, 2013, Dr. Jeanne Kuslis, a non-examining State-agency physician, completed a Physical Residual Functional Capacity Assessment of the plaintiff in which she opined that the plaintiff can occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; push and/or pull subject to the limitation for lifting and carrying; frequently climb ramps/stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl. (Tr. 128-30). Dr. Kuslis opined that the plaintiff had no manipulative limitations, visual limitations, or communicative limitations, but had environmental limitations such that he should avoid concentrated exposure to vibration or hazards. (Tr. 128-29).

On March 3, 2014, Dr. Virginia Rittner reached the same conclusions as Dr. Kuslis, namely that the plaintiff is limited to occasionally lifting and/or carrying twenty pounds; frequently lifting and/or carrying ten pounds; standing, walking or sitting for a total of six hours in an eight-hour day; and, occasionally stooping, kneeling, crouching, and crawling due to his chronic low back pain and narcotic use. (Tr. 141-42; *see* Tr. 141-44). Additionally, Dr. Rittner concluded that the plaintiff must avoid concentrated exposure to vibration and hazards, and cannot be exposed to unprotected heights. (Tr. 142-43). In his decision, the ALJ concluded that "the opinions of the State agency medical consultants are . . . well-supported by objective physical findings and the results of medically acceptable imagining studies and are consistent" with the plaintiff's reported activities of daily living; thus, the ALJ "accorded [these opinions] great weight[.]" (Tr. 27).

The Second Circuit has recognized that "[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source." *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993). However, the opinions of non-examining sources may "override treating sources' opinions, provided they are supported by evidence in the record." *Id.* (citing 20 C.F.R. §§ 404.1527(f) [now (e)] and 416.927(f) [now (e)]). Thus, if the ALJ concludes that the opinion of a non-examining source is entitled to greater weight than the opinion of a treating physician, the ALJ must set forth "'good reasons' for not crediting the opinion" of the treating physician. *Burgess*, 537 F.3d at 129-30, (quoting *Snell,* 177 F.3d at 133); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

In his decision, the ALJ considered Dr. Garden's opinion in which he stated that the plaintiff "has not worked in several years and [the doctor] doubt[s] that [plaintiff] will be able to

find any type of occupation/employer that will be able to work around his restrictions." (Tr. 658). The ALJ "accorded little weight" to this opinion on grounds that it was "undated and is unsupported by objective medical evidence." (Tr. 27). The ALJ noted that, while the plaintiff could not perform his past work as an exterminator, the RFC contemplates the plaintiff's limitations "which are supported by the treatment notes and the claimant's reported activities of daily living." (Tr. 27). However, as discussed above, the ALJ has selectively focused on certain activities of daily living, at the exclusion of the treatment notes and objective medical records.

The plaintiff treated with his orthopedist, Dr. Garden, from 2006 to late 2012 – from his alleged onset date of disability until his date last insured. Dr. Garden's records are thorough and, as discussed at length above, *see* Section III.C.2. *supra*, reflect consistent treatment for the plaintiff's pain and limitations due to his back impairment. Additionally, Dr. Garden is an orthopedic surgeon specializing in spine surgery. *See* 20 C.F.R. § 404.152(c)(2); *see Selian*, 708 F.3d at 417. None of the foregoing factors were expressly considered by the ALJ.

The ALJ is correct that one opinion from Dr. Garden, which was directed to Allingham & Spillane, is undated. (*See* Tr. 27; *see* Tr. 658). There is a second letter, however, which is directed to the same law firm, dated October 1, 2009. The ALJ does not reference it. In that letter, Dr. Garden elaborates on the plaintiff's "permanency, work status, future treatment and prognosis." (Tr. 314). The defendant is correct that an opinion on the ultimate issue of disability is reserved to the Commissioner, *see* SSR 96-5p, 1996 WL 374183, at *2 (S.S.A. July 2, 1996), but these opinions from Dr. Garden regarding the plaintiff's disability status were made for the purposes of workers' compensation. Although workers' compensation determinations are not binding because "different rules and standards" apply, SSR 06-03p, 2006 WL 2329939, at *6-7 (S.S.A. Aug. 9, 2006); 20 C.F.R. §§ 404.1504, 404.1527(d)(1), these opinions "cannot be ignored." SSR 06-03p,

2006 WL 2329939, at *6; SSR 96-5p, 1996 WL 374183, at *2; *see also Snell*, 177 F.3d at 134 ("Reserving the ultimate issue of disability to the Commissioner . . . does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited."). "In other words, an ALJ must consider the medical opinions underlying and informing a treating physician's disability assessment." *Mercado v. Colvin*, 15 Civ. 2283(JCF), 2016 WL 3866587, at *15 (S.D.N.Y. July 13, 2016) (citations omitted).

The ALJ rejected Dr. Garden's opinion as "unsupported by objective medical evidence[,]" yet the ALJ did not explain what objective medical evidence, if any, he relied on to reach that conclusion. As discussed at length above, Dr. Garden's treatment records support his assessment of the disabling nature of the plaintiff's pain, which is also supported, as Dr. Garden specified, by EMG results confirming L5-S1 radiculopathy. Moreover, his treatment records evidence the plaintiff's use of prescription pain medicine during the relevant period at issue, which, as Dr. Garden stated, "affects [plaintiff's] ability to concentrate[.]" (Tr. 314). Accordingly, on remand, the ALJ shall also reconsider whether Dr. Garden's opinions are entitled to controlling weight in light of the evidence of record. If the ALJ determines that they still are not, he must provide good reasons for that decision.

The plaintiff also contends that the ALJ erred in his treatment of Dr. Turchiano's opinion. (Pl.'s Mem. at 39-44).[17] In the assessment, Dr. Turchiano reported that the plaintiff suffers from "severe pain daily" (Tr. 1575), which pain is severe enough to "[c]onstantly" interfere with plaintiff's attention and concentration, cause him to be "off task" more than 30% of the work day, absent five or more days a month, and unable to work on sustained basis. (Tr. 1579). Additionally, Dr. Turchiano assessed limitations to the plaintiff's ability to walk, climb, balance and stoop, and

---

[17] The ALJ incorrectly attributed that physical capacity assessment completed in June 2015 to Dr. Garden, when such assessment was completed by Dr. Turchiano. (Tr. 27).

opined that he needs to lie down and/or recline due to fatigue and pain "[a]bout [four] hours" in a work day. (Tr. 1576-77). According to Dr. Turchiano, the plaintiff would need to tack unscheduled breaks every thirty minutes and he should have his legs elevated 90% of the time. (Tr. 1577). Additionally, Dr. Turchiano concluded that the plaintiff can lift up to ten pounds occasionally, and can rarely carry up to ten pounds. (Tr. 1578). The ALJ assigned "little weight" to the findings in this assessment on grounds that the "extreme limitations set forth therein are not supported by objective physical findings and are [not] consistent with the claimant's complaints, the nature and frequency of treatment and the claimant's reported activities of daily living." (Tr. 27).

Dr. Turchiano is plaintiff's primary care physician; he has treated the plaintiff since 2012 for various ailments, including plaintiff's back pain.[18] However, his assessment was completed two and half years after the plaintiff's date last insured. (*See* Tr. 1579).[19] Additionally, Dr. Turchiano's statement specifically relates to the plaintiff's impairments, symptoms and limitations "since [July 20, 2013]," nearly six months after the plaintiff's date last insured. (*See* Tr. 1575). Accordingly, the ALJ did not err in not assigning controlling weight to Dr. Turchiano's opinion.

IV.   CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 25) is *granted in part and denied in part*, and the defendant's

---

[18] *See* Section III.C.2. *supra*.

[19] As noted above, the plaintiff's date last insured was December 31, 2012 (*see* Tr. 21); the bulk of treatment from Dr. Turchiano occurred after this date; the records evidence a continuation of the plaintiff's pain. *See Ventura v. Barnhart*, No. 3:04CV1401(SRU)(WIG), 2006 WL 1272668, at *20 (D. Conn. Feb, 2, 2006) ("The Second Circuit has held that medical records that post-date the date last insured may be relevant to bolster the credibility of the plaintiff's subjective complaints."); (*see* Tr. 744-47, 1622-23, 1651-56 (March and April 2013 visits for lower back and hip pain); Tr. 715-16, 748-51, 1657-58 (April and May 2013 visits for back pain, left hip pain, myalgia and arthralgia); Tr. 480-85, 654-57); Tr. 486-90, 493-94, 629-30, 633-34, 637-42, 646-47, 650-51 (August through December 2013 visits for "constant[,]" "[p]ersistent[,]" and "severe" back pain; Tr. 586-87 (December 2014 visits for lower back); Tr. 109-10, 586-87, 594-96 (treatment for knee pain in 2014 and early 2015)).

Motion to Affirm (Doc. No. 35) is *denied in part and granted in part* such that this case is remanded for the reasons stated in this Ruling.

Dated this 7th day of June, 2018 at New Haven, Connecticut.

 /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge